UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**DANIEL T. MCNALLEY**,                                   Case No. 3:10 CV 2692

        Plaintiff,                                   Judge James G. Carr

   v.                                                                 REPORT AND RECOMMENDATION

**COMMISSIONER OF SOCIAL SECURITY,**

        Defendant.                                   Magistrate Judge James R. Knepp, II

### INTRODUCTION

Plaintiff Daniel T. McNalley appeals the administrative denial of disability insurance benefits (DIB) under 42 U.S.C. § 1383. The District Court has jurisdiction over this case under 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). For the reasons given below, the Court recommends the Commissioner's denial of benefits be affirmed.

### BACKGROUND

Born in 1973, Plaintiff was 36 years old at the time of the hearing. (Tr. 116, 120). Plaintiff attended special education classes until he dropped out of school around the eleventh grade. (Tr. 33, 149). He then received his GED in 1995. (Tr. 40, 149). Upon entering the local carpenters union, he attended a trade school and became a journeyman carpenter. (Tr. 149). He performed work for numerous construction companies while in the union. (Tr. 153). He later earned about 30 credits at a community college. (Tr. 34).

Plaintiff alleges disability with an onset date of November 1, 2005. (Tr. 117). The ALJ determined, and Plaintiff does not dispute, that Plaintiff's last date of meeting the insured status requirements of the Social Security Act was March 31, 2008. (Tr. 12; Doc. 8, at 4).

Medical History

Plaintiff has an extensive treatment and evaluation history for his recurrent neck and back pain, which began after he was injured in a car accident. (Tr. 270). Plaintiff has been diagnosed with lumbar cervical disc disease. (Tr. 191). He started seeing his primary care physician, Dee Ann Bialecki-Haase, M.D., in January 2002. (Tr. 197). In April 2004, Dr. Bialecki-Haase first prescribed Vicodin for Plaintiff's back pain. (Tr. 196). The next month, Plaintiff returned to Dr. Bialecki-Haase for depression and back pain, at which point Dr. Bialecki-Haase noted Plaintiff's steady weight gain. (Tr. 195).

In October 2004, Plaintiff saw Dr. Bialecki-Haase for a follow up for his chronic back pain, but he also complained of neck pain. (Tr. 193). Dr. Bialecki-Haase reported intact reflexes and sensation, no difficulty with gait, and "some mild decreased range of motion, specifically with extension." (Tr. 193). Dr. Bialecki-Haase also wrote in her records, "I think he does misuse his medications because he has more pain", and set strict daily limits for Plaintiff's pain medications. (Tr. 193). The same month, Plaintiff was diagnosed by Dean Hountras, M.D., with a small central disc herniation at C5-C6 and C6-C7 as well as a paracentral disc protrusion or bulge at the C3-C4 disc. (Tr. 311).

In December 2004, Plaintiff returned to Dr. Bialecki-Haase complaining of back, neck, and leg pain. (Tr. 192). Dr. Bialecki-Haase reported intact strength and reflexes, a reduction in range of motion of the LS spine, and a negative straight leg raise test. (Tr. 191). At this time, Dr. Bialecki-Haase prescribed Cymbalta for Plaintiff's pain, though later changed this because Plaintiff reported feeling jittery and anxious as a result of taking Cymbalta. (Tr. 191–192). In January 2005, Dr. Bialecki-Haase noted Plaintiff had "near full range of motion." (Tr. 191).

2

Plaintiff has had long-term problems losing weight. (Tr. 196, 199). Plaintiff admitted to his psychologist the he gained upwards of 80 pounds resulting from eating more, exercising less, and quitting smoking. (Tr. 253). Between his alleged disability onset date and the date he was last insured, his weight increased from about 288 pounds to 305 pounds. (Tr. 190, 372). His primary care physician has advised him to lose weight, gradually if possible. (Tr. 372). As a result of his size, Plaintiff reported being able to walk only 100 feet before needing to stop and rest. (Tr. 166). He uses a cane to walk and has reported difficulty dressing and bathing. (Tr. 163, 167).

In May 2005, Plaintiff saw Gerald T. Bihn, M.D., who diagnosed a focal disc herniation at the T5-5 level and a syrinx. (Tr. 301, 308). Dr. Bihn further diagnosed disc bulging at the T9-T10, T10-T11, and T12-L1 levels. (Tr. 309). Because of the syrinx, Dr. Bihn referred Plaintiff to a neurosurgeon. (Tr. 301–302).

In June 2005, on referral from Dr. Bialecki-Haase for a rheumatologic consultation, Plaintiff was seen by William H. Treuhaft, M.D. (Tr. 212, 215). Dr. Treuhaft concluded Plaintiff "is suffering primarily from fibromyalgia syndrome, with diffuse, musculoskeletal pain, primarily in the muscles." (Tr. 214). Dr. Treuhaft noted Plaintiff "gives a fairly typical history of fibromyalgia" but remarked, "there are absolutely no findings of any arthritis". (Tr. 214). In his recommendations, Dr. Treuhaft opined that Plaintiff's caffeine consumption "may be contributing" to his sleep disturbance. (Tr. 214). He also recommended trying a then-new drug, Cymbalta, for Plaintiff's pain. (Tr. 214).

Throughout 2006, Plaintiff visited the Bayside Center for Pain Management, where he was treated by William G. James, Jr., M.D. (Tr. 229). Over the course of treating him, Dr. James diagnosed Plaintiff with degenerative disc disease (Tr. 227), lumbar spondylosis (Tr. 217, 222) and cervicogenic headaches (Tr. 217). In February 2006, Dr. James noted Plaintiff has good grip

3

strength, good motor strength, intact sensation, and symmetric deep tendon reflexes. (Tr. 225). Plaintiff experienced "some pain relief" from epidural steroid injections he received at the Bayside Center. (Tr. 221). Eventually, Plaintiff stopped attending the pain clinic because they prescribed him methadone, which Plaintiff did not feel comfortable taking. (Tr. 374).

In May 2007, state consultant Sushil M. Sethi, M.D., examined Plaintiff. (Tr. 270, 272). Dr. Sethi noted a "history of chronic pains in the cervial and lumbar spine" and "mild to moderate osteoarthritis of cervical spine." (Tr. 272). Dr. Sethi concluded Plaintiff's "ability to do work-related physical activities such as sitting, standing, walking, lifting, carrying and handling objects and traveling is moderately limited." (Tr. 272). State consultant Jeffrey Vasiloff, M.D., also examined Plaintiff in May 2007 for a physical residual functional capacity assessment and diagnosed osteoarthritis of the cervical spine. (Tr. 277). Dr. Vasiloff concluded Plaintiff's allegations of back injury, arthritis, neck pain, and numbness in the hands and legs "appear to be credible". (Tr. 278, 284).

Plaintiff has had several MRI's taken. In October 2004, Konstantin Poplavsky, M.D., conducted an MRI on Plaintiff and found "[a]nterior degenerative lipping involving lower cervical spine and question of degenerative disc disease at C6-C7 level". (Tr. 207). The same month, Dean M. Hountras, M.D., conducted an MRI on Plaintiff and reported "[s]mall disc herniation, C5-C6 and C6-C7 with a right paracentral disc protrusion or bulge at the C3-C4 disc". (Tr. 208). In January 2005, Dr. Hountras performed another MRI without contrast and reported "[c]ircumferential bulging of the L4-L5 and L5-S1 discs with a small central disc protrusion at L4-L5." (Tr. 206).

Notes from Dr. Bialecki-Haase show Plaintiff's back pain to be a chronic problem that persisted through the last date he met the insured status requirements for DIB. (Tr. 360–362, 364,

366, 370). Her records from after Plaintiff's last insured date also report Plaintiff has bilateral carpal tunnel that appears to be getting worse. (Tr. 415). Because of these chronic problems, Plaintiff takes pain medications five times a day. (Tr. 168). He reported being on Elavil, Neurontin, Prevacid, Vicodin, Xanex, Zanaflex, and Zoloft. (Tr. 174–175). After Plaintiff stopped being seen at the pain clinic, he reached a point of taking five Vicodin a day. (Tr. 374). He has also been diagnosed with opioid dependence. (Tr. 378, 393).

Aside from his physical impairments, Plaintiff has been evaluated and treated for psychological impairments. In August 2006, Plaintiff was evaluated by psychologist Beverly R. Damrauer, Ph.D. (Tr. 252). Dr. Damrauer made the following findings:

> Affect was normal, and his thought processes were in no way indicative of psychotic processes. There was no evidence for mental illness in Daniel's clinical presentation. Daniel was pleasant, forthcoming, and cooperative. . . . The reality is such that he would need accommodations (e.g. texts on tape), and he has good intellectual/cognitive abilities that would render positive outcomes with use of accommodations if he could get past self-perceived barriers, adequacy concerns and acceptance issues. . . . He has a learning disability in spelling/written expression. Still, he should be able to compete at the college level . . . . He does not suffer from serious psychopathology. His defenses are heightened a bit now because of life's situational stressors (e.g. medical health conditions and need for retraining in the context of LD). At most, and this is debatable, he is experiencing a mild adjustment reaction.

(Tr. 253–255). Similarly, state consultant psychologist Robelyn Marlow, Ph.D., evaluated Plaintiff in April 2007 and remarked that his previously diagnosed adjustment disorder "does not significantly affect his functioning. His major complaints are physical." (Tr. 256, 268).

In August 2008 – after Plaintiff's last date of being insured – Plaintiff was diagnosed with bipolar disorder by psychiatrist Jill M. Fox, M.D., who saw Plaintiff on referral from Dr. Bialecki-Haase. (Tr. 378, 380, 382). Dr. Fox noted Plaintiff had a violent temper, racing thoughts, hyper vigilance, agoraphobia, intense distress, and obsessions. (Tr. 380–382). In addition to bipolar

disorder, Dr. Fox diagnosed Plaintiff with anxiety disorder NOS and opioid dependence. (Tr. 378).

Administrative Hearing

On November 12, 2009, Plaintiff appeared with counsel at a video conference hearing before the ALJ. (Tr. 27–28). He explained he lives with his spouse and three children. (Tr. 33). Plaintiff's youngest children are twins who were only seven months old at the time of the hearing. (Tr. 33).

Plaintiff testified about his education. Specifically, he said he received vocational training through the Local 248 carpenters union. (Tr. 33). Several years after finishing his apprenticeship as a carpenter, Plaintiff tried to go back to college. (Tr. 33). He said he completed about 30 credit hours towards a degree in architectural engineering at Owens Community College. (Tr. 34). Plaintiff struggled and ultimately could not finish the degree. (Tr. 34).

Plaintiff testified extensively about his prior work history. He said his last job was around May 2006, when he worked for "like three days" but could not physically or mentally handle it and had to quit. (Tr. 36). Plaintiff sustained a hand injury on the job and filed a Worker's Compensation claim over it. (Tr. 37). Prior to this brief job, he had been doing subcontracting work sporadically. (Tr. 37). This included doing bathroom and garage work as his own contractor. (Tr. 38). He did that for about a year and a half, but Plaintiff said he "couldn't handle it anymore" because he was "just getting broken down" and "wasn't quite stable" mentally. (Tr. 36–37).

Before striking it out on his own as a contractor, Plaintiff worked construction for seven to nine years as a member of the Local 248 Carpenters Union. (Tr. 38). As a carpenter, Plaintiff mostly did scaffold and concrete work. (Tr. 38). It took him five years – a year longer than most people – to complete his apprenticeship. (Tr. 38). Plaintiff's work history also includes work at a family-owned bar and an auto parts store. (Tr. 40).

6

Plaintiff said his back pain began when he was in his 20s, having first sought treatment for it between 2000 and 2002. (Tr. 41–42). He described it as a constant, radiating pain in his lower back, but also said there is a stiffness and tightness in his neck. (Tr. 42). Plaintiff testified he feels electrical shock-like sensations running down both his legs in the morning. (Tr. 42). He said moving his neck a lot causes constant headaches. (Tr. 43). He testified these ailments have only gotten worse since 2005, with no kind of therapy or injection ever helping. (Tr. 43). When asked if he could return to work, Plaintiff said it would be physically impossible for him to work 40 hours a week as a carpenter because he would need to take constant breaks. (Tr. 51).

Plaintiff also testified about his psychological and learning problems. He said he has panic attacks and admitted to considering suicide at one point in time. (Tr. 44). When he has panic attacks, he said it is hard to breathe and his mind "starts just going nuts"; he gets "angry and confused and upset". (Tr. 50). Plaintiff said these attacks can be triggered five or six times a month and sometimes last up to an hour and a half at a time. (Tr. 50). When asked about his learning disabilities, he said he has trouble remembering things and "just could not grasp" math. (Tr. 44). But he testified he helps his son with any homework he has. (Tr. 47). He also said he has anxiety and problems multi-tasking. (Tr. 45). The ALJ asked Plaintiff why he had refused to see a therapist, to which Plaintiff responded he did not have the money to do so. (Tr. 52).

In terms of Plaintiff's residual capacity, he said he drives once or twice a week to get cigarettes or go grocery shopping. (Tr. 36). But he said he has trouble bending over and crawling. (Tr. 45). He takes a nap "usually every day" because his medications make him tired. (Tr. 46, 48). However, he testified he has difficulty sleeping at night mainly because of his neck pain. (Tr. 48). Some days are better than others for Plaintiff; he testified that about half the days in a month he just

7

takes pain pills and sleeps on the couch. (Tr. 49).

Also testifying at the hearing was vocational expert Amy Kutschbach. (Tr. 53). Kutschbach clarified the exertional and skill levels of Plaintiff's relevant prior work, noting he had worked in skilled positions with a medium to heavy exertional level. (Tr. 55–56). The ALJ asked Kutschbach to assume a hypothetical person with the same restrictions Plaintiff has – able to lift or carry 20 pounds occasionally, lift or carry 10 pounds frequently, stand and walk for about six hours a day with normal breaks, but limited to no bilateral overhead reaching and only occasionally climbing, balancing, stooping, kneeling, crouching, and crawling – and then testify as to whether such an individual could perform Plaintiff's past relevant work. (Tr. 56–57). Kutschbach testified such a hypothetical individual could still perform the work Plaintiff did at the auto parts store. (Tr. 57).

The ALJ then added a restriction to the hypothetical individual: that he would likely be off task five percent of the day in addition to regularly scheduled work breaks due to trouble maintaining concentration. (Tr. 57). Kutschbach was then asked what, if any, additional jobs in the national economy such a person could perform, and she replied with the positions of wire cutter, stock checker, and gas station clerk. (Tr. 57–58). According to her testimony, these jobs together account for about 1,000 positions in the region and about 150,000 positions in the state. (Tr. 58).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as

8

a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the Court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for DIB is predicated on the existence of a disability. 42 U.S.C. §§ 423(a)(1)(E). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

9

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The Court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)–(f), 416.920(b)–(f); *see also Walters*, 127 F.3d at 529.

### DISCUSSION

The ALJ determined Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments, having analyzed the evidence under listings 1.04, 1.00Q, 3.00I, 4.00F, 12.04, and 12.06. (Tr. 13). The ALJ then concluded Plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b). (Tr. 15).

Plaintiff makes three arguments against the ALJ's decision: (1) A listed impairment should apply because the Commissioner erred in the assessments of § 1.04(A) and the paragraph B criteria of § 12.04; (2) The Commissioner erred by failing to adequately consider Plaintiff's subjective allegations along with the objective medical evidence; and (3) The Commissioner erred in finding that Plaintiff is capable of performing light work.

Evidence Submitted to the Appeals Council

After the ALJ's determination, Plaintiff submitted new evidence to the Appeals Council, which thereafter denied review. (Tr. 1). It is critical to Plaintiff's arguments before this Court that this evidence be included in the record. At the hearing, Plaintiff's attorney acknowledged the ALJ

10

had all the pertinent records at that time. (Tr. 30).

Defendant correctly points out that the proper method for obtaining review of new evidence submitted to the Appeals Council is to request a sentence six remand under 42 U.S.C. § 405(g). While a claimant may, pursuant to 20 C.F.R. § 404.970(b), submit new and material evidence to the Appeals Council for its consideration, once the Appeals Council denies review, the ALJ's opinion becomes the final decision of the Commissioner. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993). Plaintiff cites cases from other circuits to argue the record to be considered should include medical records up to the date of the Appeals Council decision, since that is when the ALJ's decision becomes final. Indeed, as the Third Circuit has remarked, there is a circuit split over this issue:

> Some courts hold that such evidence should be considered by the district court in its review of the final decision of the Commissioner, *see Perez v. Chater*, 77 F.3d 41, 45 (2nd Cir. 1996); *O'Dell v. Shalala*, 44 F.3d 855, 859 (10th Cir. 1994); *Ramirez v. Shalala*, 8 F.3d 1449, 1452 (9th Cir. 1993); *Nelson v. Sullivan*, 966, F.2d 363, 366 (8th Cir. 1992); *Wilkins v. Sec'y of HHS*, 953 F.2d 93, 96 (4th Cir. 1991) (en banc), whereas others hold that evidence not presented to the [ALJ] should not be reviewed by the district court nor be the basis of a remand to the Commissioner unless the evidence is new and material and there is good cause for not having produced the evidence earlier, *see Falge v. Apfel*, 150 F.3d 1320, 1322–23 (11th Cir. 1998), . . . *Cotton v. Sullivan*, F.3d 692, 695–96 (6th Cir. 1993); *Eads v. Sec'y of HHS*, 983 F.2d 815, 817–18 (7th Cir. 1993) .

*Matthews v. Apfel*, 239 F.3d 589, 589 (3rd Cir. 2001).

As the court in *Matthews* correctly identified, case law in the Sixth Circuit is squarely against Plaintiff on this issue. In fact, in *Casey*, the Sixth Circuit addressed the identical argument Plaintiff now makes:

> Plaintiff also argues that additional evidence submitted to the appeals council shows that the ALJ's decision was not supported by substantial evidence. When the appeals council denies review, the decision of the ALJ becomes the final decision of the Secretary. While new material evidence may be submitted for consideration to the

11

> appeals council pursuant to 20 C.F.R. § 404.970, on appeal we still review the ALJ's decision, not the denial of review by the appeals council. While it is possible that a court 'may at any time order additional evidence to be taken before the Secretary,' a court may only do so 'upon showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.'

*Casey*, 987 F.2d at 1233 (citations omitted) (quoting 42 U.S.C. § 405(g)); *see also Phelps v. Sec'y of Health & Human Servs.*, 1992 WL 92792, at *2 (6th Cir. 1992) ("[W]e review the ALJ's decision, not an Appeals Council's denial of review.").

Barring good cause shown, the Sixth Circuit has only considered new evidence submitted to the Appeals Council to be part of the administrative record if the Appeals Council specifically incorporated it as such. *Wilkins v. Sec'y, Dept. of Health & Human Servs.*, 953 F.2d 93, 96 (6th Cir. 1991). Here, the Appeals Council denied review following Plaintiff's submission of new evidence. (Tr. 1). Thus, contrary to Plaintiff's argument, Plaintiff must show good cause for the Court to order additional evidence to be taken before the Commissioner under sentence six of 42 U.S.C. § 405(g). Plaintiff has not attempted to do so. Therefore, the Court will not consider any evidence not in the record when the ALJ made his decision.

Listed Impairments

Plaintiff argues the ALJ's determination that Plaintiff's impairments do not meet or equal the listings is unsupported by substantial evidence. Specifically, Plaintiff argues the ALJ erred in his assessments of Listings 1.04 and 12.04. Listing 1.04 describes certain musculoskeletal impairments of the spine:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution

of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04.

The ALJ concluded Plaintiff's impairments did not meet the severity of 1.04, saying, "Although the claimant has documented pain, clinical examinations failed to conclusively identify motor loss accompanied by sensory and reflex loss." (Tr. 13). On review of the record, this conclusion is supported by substantial evidence. Several reports from Plaintiff's treating physicians indicate Plaintiff did not have motor loss, did not have sensory or reflex loss, and sometimes did not have limited range of motion. For instance, Dr. James noted in February 2006, "Range of motion is preserved. . . . Symmetric deep tendon reflexes. Intact sensation." (Tr. 331). At that time, Dr. James also said Plaintiff's reflexes were intact with "no evidence of any sensory deficits." (Tr. 296). Similarly, in March 2006, Dr. James found Plaintiff had "[e]xcellent grip strength in the upper extremity with symmetric deep tendon reflexes and intact sensory and motor examination." (Tr. 323). These findings (e.g., "intact sensory and motor examination") were repeated by Dr. James throughout Plaintiff's treatment relationship with him. (Tr. 217, 293, 296–298, 323, 331). Plaintiff's primary care physician, Dr. Bialecki-Haase, reported the same ("sensation, reflexes are intact") in February 2006. (Tr. 374). Dr. Bialecki-Haase also reported in January 2005 that Plaintiff had "near full range of motion." (Tr. 191).

13

Physicians who had non-recurrent exposure to Plaintiff made findings consistent with those of Drs. James and Bialecki-Haase. In June 2005, Dr. Treuhaft – who saw Plaintiff on referral for possible arthritis – noted, "The spine shows a fairly straight spine with no obvious superficial deformities. . . . The range-of-motion appears to be well preserved." (Tr. 213–214). Similarly, Frederick Workman, M.D., reported, "He does have near full range of motion. Upper extremity strength is intact. Examination of the lower spine reveals near full range of motion in the lumbar spine." (Tr. 191).

Furthermore, Plaintiff's medical records show multiple negative straight-leg raising tests. (Tr.192, 374). All of these findings support the ALJ's conclusion that Plaintiff's impairments do not meet Listing 1.04. The ALJ's determination on this issue was therefore supported by substantial evidence.

Plaintiff also argues the ALJ erred in analyzing the paragraph B criteria of Listing 12.04. This listing describes affective disorders:

> Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation. The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
> . . .
> B. Resulting in at least two of the following:
> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each of extended duration[.]

20 C.F.R. Part 404 Subpt. P, App. 1, § 12.04.

The ALJ determined there was no evidence Plaintiff has restricted activities of daily living due to a mental condition, noting that "[h]e is able to able to take care of personal hygiene, perform

14

light household chores, attend appointments as necessary, and handle finances". (Tr. 14). The ALJ

also found no evidence of any episodes of decompensation. (Tr. 14). For social functioning, the ALJ

concluded the record as a whole established a mild degree of limitation because, while Plaintiff

shows a tendency to avoid being in public, he "is able to respond appropriately when spoken to,

relate satisfactorily, and is able to initiate conversation". (Tr. 14). Finally, the ALJ found moderate

limitations in maintaining concentration, persistence, or pace, "such that he will have an occasional

interference in the ability to concentrate and will be off task approximately 5% of the time". (Tr. 14).

     The regulations provide guidance on how to consider activities of daily living in the context

of a mental impairment:

> Activities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office. In the context of your overall situation, we assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability. We will determine the extent to which you are capable of initiating and participating in activities independent of supervision or direction.

20 C.F.R. 404, Subpt. P., App. 1, § 12.00C(1). Here, there is substantial evidence in the record

supporting the ALJ's conclusion that Plaintiff has no restriction in his activities of daily living due

to a mental condition. For example, Plaintiff testified he is able to drive himself to go shopping for

food and cigarettes (Tr. 36, 49), and sometimes helps cook meals (Tr. 47). Plaintiff is also able to

"oversee" his infant children by himself for several hours every day without supervision. (Tr. 47).

In addition, Plaintiff's medical records reflect no restrictions in this area; Dr. Marlow reported

Plaintiff "is able to cook, drive, shop, and handle is his own finances. He watches TV, plays guitar,

and spends time with others. [His psychological] disorder does not significantly affect his

functioning." (Tr. 268). The ALJ had substantial support for his conclusion about restrictions on

15

Plaintiff's activities of daily living.

The regulations also describe how difficulties in social functioning due to mental impairments are assessed:

> Social functioning refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. Social functioning includes the ability to get along with others. . . . You may demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation. . . . We do not define 'marked' by a specific number of different behaviors in which social functioning is impaired, but by the nature and overall degree of interference with functioning.

20 C.F.R. 404, Subpt. P., App. 1, § 12.00C(2). Here, the ALJ determined Plaintiff has a mild limitation in social functioning. (Tr. 14). On review of the record, substantial evidence supports this conclusion.

The evidence in the record that reflects Plaintiff has a tendency to isolate himself from the public[1] is primarily evidence that was not before the ALJ, and therefore cannot be considered by this Court, as explained above. More importantly, the medical evidence in the record suggests these social functioning difficulties do not rise to the level of being marked difficulties. His treating psychologist, Dr. Damrauer, actually reported that his "[s]ocial [i]nversion scale is not surprisingly at the extroverted end; *he is a people person*." (Tr. 255) (emphasis added). Similarly, state consultant Dr. Marlow reported Plaintiff's social functioning difficulties to be "mild". (Tr. 266). Furthermore, in his testimony, Plaintiff did not once mention any difficulties with social functioning. Therefore, the record substantially supports a finding of no more than mild difficulties in social functioning.          As for maintaining concentration, persistence, or pace, the regulations once

---

1. For instance, Plaintiff reported to the SSA that he is "a loner kind of guy" and does not like being around other people. (Tr. 69). Dr. Fox also reported him to be agoraphobic. (Tr. 382).

again provide the relevant standards:

> Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings. Limitations in concentration, persistence, or pace are best observed in work settings, but may also be reflected by limitations in other settings. . . . Deficiencies that are apparent only in performing complex procedures or tasks would not satisfy the intent of this paragraph B criterion. However, if you can complete many simple tasks, we may nevertheless find that you have a marked limitation in concentration, persistence, or pace if you cannot complete these tasks without extra supervision or assistance, or in accordance with quality and accuracy standards, or at a consistent pace without an unreasonable number and length of rest periods, or without undue interruptions or distractions.

20 C.F.R. 404, Subpt. P, App. 1, § 12.00C(3). The ALJ found Plaintiff had moderate difficulties in this area. (Tr. 14). The record shows this to be substantially supported. Plaintiff testified he has a bad memory and as a result could not keep up with his community college classes even though accommodations were made for his learning disability. (Tr. 44). He also testified working 40 hours a week would be emotionally, as well as physically, impossible for him. (Tr. 51). However, the medical evidence suggests no more than mild to moderate difficulties in this area. Psychologist Dr. Damrauer reported findings "inconsistent with memory dysfunction" and concluded Plaintiff's memory function appeared average. (Tr. 254). She also reported test results "very inconsistent with ADHD." (Tr. 254). Similarly, Dr. Marlow did not check the box for "memory impairment" in her evaluation of Plaintiff (Tr. 257) and reported Plaintiff's difficulties in maintaining concentration, persistence, or pace to be mild (Tr. 266). Consequently, the ALJ's conclusion that Plaintiff had no more than moderate difficulties in maintaining concentration, persistence, or pace is supported by substantial evidence.

Plaintiff does not dispute the ALJ's finding of no episodes of decompensation, and Plaintiff's medical records confirm this finding. (Tr. 266). Because the ALJ's conclusion as to each of the

paragraph B criteria is supported by substantial evidence, his conclusion that Plaintiff did not meet this listed impairment shall not be disturbed.

<u>Plaintiff's Ability to Perform Light Work</u>

Plaintiff's arguments against the ALJ's determination of Plaintiff's residual functional capacity (RFC), and that the ALJ failed to adequately consider Plaintiff's subjective allegations, require analysis of the same concepts. Plaintiff argues the ALJ's determination that Plaintiff is capable of performing light work is unsupported by substantial evidence. While Plaintiff cites to evidence supporting a contrary conclusion, the Court must nonetheless affirm the ALJ's decision so long as it is supported by substantial evidence. *Jones*, 336 F.3d at 477.

The regulations define "light work":

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. 404.1567(b). Here, there is slightly conflicting evidence in the record. At first, Plaintiff testified he has to ask for help at the grocery store if he needs "to get like two" 20-pound bags of dog food, implying he does not need help lifting or carrying just one 20-pound bag. (Tr. 36). Later, Plaintiff clarified his testimony somewhat:

> [I]f I go to the grocery store and, you know, I try to get some help and there's nobody around and I got to get a 20-pound bag of dog food and I got to get two or three of them, you know, when I pick that – pick them up, I mean, I want to just stop right there. You know, I can't move for five, ten minutes right at that point.

(Tr. 49). In addition, Plaintiff testified he has difficulty bending ("there's physically no way I could bend over"), stooping, or crawling. (Tr. 45). The ALJ concluded these were all "self-imposed

18

restrictions not supported by the medical evidence". (Tr. 15). The ALJ even concluded Plaintiff is capable of occasionally bending, stooping, and crawling despite his clear testimony to the contrary. (Tr. 15). Plaintiff therefore argues the ALJ erred by failing to adequately consider his subjective allegations of pain.

An ALJ's credibility determination "should not be discarded lightly and should be accorded deference." *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1234 (6th Cir. 1993). Furthermore, "a claimant's subjective allegations of disabling pain are insufficient by themselves to support a claim for benefits." *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 713 (6th Cir. 1988). When Congress passed the Social Security Disability Benefits Reform Act of 1984, it explicitly required "medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment" to support a claim of disability. 42 U.S.C. § 423(d)(5)(A). "An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability". 42 U.S.C. § 423(d)(5)(A). Subjective claims of disabling pain must therefore be supported by objective medical evidence. *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 852–853 (6th Cir. 1986).

Here, the ALJ found Plaintiff's statements concerning his impairments and their impact on his ability to work more limited and restricted than the medical evidence establishes. (Tr. 15). The ALJ said he had reviewed the record as a whole and found "no credible medical statement from a treating source" that substantiated Plaintiff's claim for benefits. (Tr. 16). On review of the transcript, the Court believes this conclusion is supported by substantial evidence. Plaintiff's medical records do not substantiate his claimed limitations.

Supporting the ALJ's decision on this issue is the physical RFC assessment conducted by

19

Dr. Vasiloff in May 2007. In it, Dr. Vasiloff determined Plaintiff could occasionally lift or carry 20 pounds and frequently lift or carry 10 pounds, sit for a total of about 6 hours in an 8-hour workday, and stand or walk for a total of about 6 hours in an 8-hour workday. (Tr. 278). Dr. Vasiloff also found no established postural limitations. (Tr. 279). He made these findings while still concluding Plaintiff's pain allegations "appear to be credible." (Tr. 284).

Around the same time Plaintiff saw Dr. Vasiloff, he was examined by state consultant Dr. Sethi. (Tr. 270). Dr. Sethi's findings somewhat contradict Dr. Vasiloff's RFC assessment. That is, Dr. Sethi reached the conclusion that Plaintiff's "ability to do work-related physical activities such as sitting, standing, walking, lifting, [and] carrying . . . is moderately limited." (Tr. 272).

The regulations categorize medical opinions as being from treating sources, non-treating sources, or non-examining sources. 20 C.F.R. § 404.1502. Generally, the opinion of a treating source is accorded greater deference than a non-treating source. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007). In fact, the opinion of a non-treating source "can never be entitled to controlling weight." SSR 96-2P, 1996 WL 374188, at *2. The Sixth Circuit has similarly found that an RFC assessment performed by a non-treating physician is not entitled to controlling weight, noting that a single visit to a physician does not constitute an ongoing treatment relationship. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 505–508 (6th Cir. 2006) (citing *White v. Barnhart*, 415 F.3d 654, 658 (7th Cir. 2005)).

Here, Dr. Vasiloff – a state consultant – is a non-treating source under the regulations because he did not have an ongoing treatment relationship with Plaintiff; rather, the record reflects he saw Plaintiff once for an assessment of his residual functional capacity. (Tr. 277–284); *see* 20 C.F.R. § 404.1502. Similarly, Dr. Sethi – another state consultant – is a non-treating source because

the record shows he only examined Plaintiff once. (Tr. 270–272). As such, these opinions cannot be entitled to controlling weight under SSR 96-2P. Nonetheless, Dr. Vasiloff's assessment is objective medical evidence directly supporting the ALJ's conclusion that Plaintiff is capable of performing light work, while Dr. Sethi's opinion provides objective medical support for Plaintiff's allegations. Though not entitled to controlling weight, both opinions are still accorded "great weight" as "other acceptable medical source[s]" under SSR 96-2P. The ALJ is thus entitled to use them for determining the credibility of Plaintiff's subjective allegations. Under the statute, Plaintiff's testimony about his inability to lift or carry 20 pounds without significant pain is, by itself, insufficient to establish disability. *See* 42 U.S.C. § 423(d)(5)(A).

None of Plaintiff's treating sources have confirmed his claimed physical or psychological limitations, even though non-treating consultant Dr. Sethi appears to have done so. To the contrary, in terms of his mental impairments, Dr. Damrauer said, "[a]t most, and this is debatable, he is experiencing a mild adjustment reaction." (Tr. 255). In terms of his physical impairments, Dr. James, Plaintiff's treating physician for recurring back and neck pain, repeatedly noted positive findings such as good grip strength, good motor strength, intact sensation, and symmetric deep tendon reflexes. (Tr. 225, 296, 217, 293, 296–298, 323, 331). The record indicates Plaintiff even experienced "some pain relief" while being treated by Dr. James. (Tr. 221). Plaintiff's treating sources have also reported Plaintiff's range of motion as not limited or only slightly restricted on multiple occasions. (Tr. 191, 213–214). Dr. Vasiloff's non-treating RFC assessment not only concurred with all of these treating sources' assessments (Tr. 283), but further reported Plaintiff's impairments were "not severe" (Tr. 256). Thus, even though a not insignificant amount of evidence supports Plaintiff's position, there is still substantial support in the record for the ALJ's

21

determination that Plaintiff's subjective allegations are not credible and Plaintiff is capable of performing light work. The Court may not reverse under such circumstances. *See Jones*, 336 F.3d at 477.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and applicable law, the Court finds the Commissioner's decision denying DIB supported by substantial evidence. The undersigned therefore recommends the Commissioner's decision be affirmed.

        s/James R. Knepp, II
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).